Case number 20-1434 APLET LLC et al. v. DTE Pontiac North LLC et al. Arguments not to exceed 15 minutes per side. Mr. Phillips, you may proceed for the appellants. Thank you. May it please the court, my name is Rich Phillips. I'm here on behalf of the appellants and I've reserved three minutes for my rebuttal. The district court erred in dismissing appellant's claims against DTE Energy at the pleading stage. This dismissal allows DTE Energy to escape liability for an environmental mess that it created and then walked away from. There are two primary ways in which DTE Energy can be liable in this case. The first is on its parental guarantee that it's signed of the utility services agreement and the second is as the alter ego of its subsidiary DTE Pontiac North. In the interest of time, I intend to focus on those two issues from our briefing this morning. I'm happy to discuss other issues if the court has questions, but otherwise I will leave those issues to our brief. The district court erred in dismissing the claims against DTE Energy on its parental guarantee by erroneously concluding that the utility services agreement, which is the agreement DTE Energy agreed to guarantee, had somehow terminated after rejection of these integrated agreements. There is no dispute in this case that all of the operative agreements here form an integrated whole, one contract. The primary dispute here is whether the utility services agreement could be terminated separate from those contracts that everybody agrees to be a single integrated contract. And I think it's important here that we look at the language the parties chose to put in their agreements when they signed it. Both the utility services agreement and the lease contain specific language about the fact that this is one unified contract, and specifically each party acknowledges, I'm quoting now, and agrees that each project contract is vital to the operation of such transaction, and that it would not have entered into any of the project contracts if the other project contracts had not been entered into as well. These contracts form an integrated whole and they are essential, each one, to the overall functioning. In the bankruptcy court during GM's bankruptcy, DTE forced GM to decide whether to reject or assume these contracts as a whole, and said they couldn't do it piecemeal. The bankruptcy code did not allow GM to reject some contracts and assume others, and it does not allow now DTE Energy to argue that it asked this court to allow. Bankruptcy code section 365H controls here. The district court cited to Michigan state law but should have focused on federal law controlled by the bankruptcy code. When a lease is rejected by a debtor, the party in possession has two options. One, they can leave and treat the lease as terminated, or two, they can stay. If they choose to stay, however, they are subject to all of the terms of the lease, and we've cited two cases to the court that make that clear. The Enray Revel case and the Enray Chestnut Ridge case, both of which say that when the party in possession, the non-debtor, chooses to remain on the premises after a lease is rejected, they are subject to all of the terms of the lease. It doesn't change the terms. The only issue is where they can look for remedy for the breach of non-performance of the debtor, but it does not change the lessee's obligations under the lease. DTEPN remained on the lease after rejection, for six years remained on the lease after rejection, and therefore elected not to terminate this integrated contract, and therefore, the utility services agreement did not terminate, and DTE Energy still has a parental obligation, guarantee obligation under that agreement. But GM obviously didn't need or want the utilities anymore because it closed its manufacturing facility, right? They did close the manufacturing facility, Your Honor, that's correct, but the point here is that's part of the reason they rejected the contract, but at that point, DTE had the option to stay or go, and they stayed, and the utility services agreement is not only about provision of utilities and services to GM, but also about all of the maintenance obligations for this facility, and it's exactly the breach of those obligations that causes the harm here. They didn't maintain it for six years. That's the allegation. They allowed the facility to deteriorate for weather to come in and to create this environmental mess. By choosing to stay, they chose to continue to live with those terms. They had the option at rejection to leave, but they didn't, and in fact, continued during those six years to take advantage of other things they were allowed to do under the lease, to try to market it, to try to use it for other things, and so there is no authority for DTE's argument that somehow they could decide to terminate the utility services agreement, but still maintain the lease. They kept all the benefits of the lease, and the bankruptcy law says they have to therefore live with the terms of the entire integrated agreement. Council, maybe just clarify this, that the service agreement provided that Pontiac North would maintain the premises in good condition, what is the parental guarantee? How is that different? The parental guarantee is DTE Energy Services. Did the parental guarantee also guarantee that the premises would not deteriorate, or is that different? The parental guarantee guaranteed basically that DTE Energy would guarantee that DTEPN would complete all of its obligations under the utility service agreement. Including not allowing the premises to deteriorate? Correct, exactly, your honor. Okay, because the other claim is that DTE Energy actually directed Pontiac North to not maintain the premises. That's correct. That's not really necessary if it's guaranteed anyway, right? I mean, I guess that's an alternative theory. The alter ego theory on that issue is an alternative theory, and then it also gets into the fact that DTE Energy is responsible for other breaches of the lease itself, and the court rejected that theory improperly, district court did, by deciding, and again, this is a fact-bound inquiry that they engaged in, even though this is a pleading stage motion. The district court decided that we had not pleaded a set of facts, that DTE Energy had improperly abused the corporate form, and I'm happy to turn to that portion of our argument, unless the court has other questions about the utility services agreement. I think your complaint does allege, does it not, that they directed Pontiac North to not maintain it? We did, and under the Ryan Racing case, which we've cited, when a parent directs its subsidiary to breach a contract, that's enough to say that there was a wrong. We also, and I think even more egregiously, have alleged that, or it's more egregious conduct on behalf of DTE, that they specifically requested money from the bankruptcy court, in a proof of claim, to cover the future obligations to maintain the premises. They got millions of dollars in the bankruptcy for that, and we've alleged that that money was immediately upstream to DTE Energy. It wasn't used. And whether this is true or not, that would go to summary judgment or trial, and not on the motion to dismiss, based upon the plausibility of the allegations in the complaint. Exactly. And that's kind of, I think that's your dismiss, and we assume everything you've said in your complaint is true, as long as it's plausible. We absolutely agree with that, your honor, obviously. And I think the difficulty here is that the district court, in saying we didn't plead an improper use of the corporate form, ignored all of those allegations, and ignored the fact that we allege that DTE Energy left DTEPN without any funds to cover its liabilities. They directed DTEPN to not do the maintenance, and then left no money to cover it, and left them holding the very large bag, and those of liability without any way to cover it. Those specific allegations are paragraphs 84 through 98 of our amended complaint, and they're very detailed. And the district court should not have ignored those allegations at the pleading stage. Are you claiming that Pontiac North had no employees of its own? That is the allegation, yes. And that the only things that were done, were done by DTE Energy. Again, another way, and there is no dispute, I don't think, the district court did not, didn't dismiss that claim on the idea that these two entities were not essentially fused, but rather on the idea that we somehow had not pleaded an improper use of the corporate form. And we have absolutely done that in the ways that I've discussed in my discussion with Judge Griffin. Yeah, well, I think at large, the district at large relied on the law that, hey, look, GM knew they were entering in this agreement, these agreements with the subsidiary, not the parent, except for the guarantee on the utility agreement. But, and that, hey, you know, they went in knowing this. So they didn't expect to hold the parent liable for all these breaches. Your Honor, I think is referring to the servo kinetics case and a couple of other cases that discuss that idea, that presumption. It's certainly not a hard and fast rule. It servo kinetics is instructive on this, as well as the Polestar case that we've set in our briefing, because it talks about the fact that the question is what could the contracting party have anticipated? And in servo kinetics, they couldn't have anticipated that the party was going to become a subsidiary here. We could not have anticipated that DTE Energy would make the decisions that it did. We couldn't have anticipated that DTEPN would essentially cease to exist, that DTE Energy would direct them not to do what they're supposed to do, that DTE Energy would essentially require DTEPN to breach the agreement. And then having done all of that would take all the assets and walk away. And again, those are the allegations that the court has to take as true at this stage, which we think are more than sufficient to overcome any presumption that might exist related to piercing the corporate bail at this stage. If the servo kinetics rule were a hard and fast one that can never be overcome, then you'd never be able to get over that hurdle. And I think I'd point to, in servo kinetics, the court cited a decision, the Dearborn case, for that same proposition. But in Dearborn, the argument was that somebody was hiding the fact that they were a subsidiary. And again, that's different than what we have here. But again, we wouldn't have expected. And I think that's the key inquiry at this stage is would we have anticipated that the parent would do the things that we've alleged the parent did here. And because we could not have, then we've alleged enough to pierce the corporate bail. And briefly, before my initial time expires, I want to remind the court, we also have a request for leave to amend, which the appellee has admitted the district court applied a heavy standard, heavier standard, on that to decide that we should not have been given leave to amend. We think that the amended complaint as it stands before the court, the district court, and this court is adequate to allege all of our claims, viable claims against DTE Energy. But if the court disagrees, then we ought to be given the opportunity to amend to address those issues, because the district court applied an incorrect standard in deciding not to allow us to amend. All right, Mr. Phillips, if we agree with you that your I would say yes, because then at that point, the court would reverse the dismissal and remand it for proceedings on the merits of our claims against DTE Energy. Yes, Your Honor. All right. Thank you. Thank you, Mr. Partee. You're on mute. Forgive me. May it please the court. My name is Peter Partee of Hunton Williams, LLP, and I am counsel for the appellees in this case, DTE Energy Services, Inc. and DTE Pontiac North, LLC. I'll refer to DTE Energy Services as the parent and DTE Pontiac North as the subsidiary for the sake of simplicity. Opposing counsel is correct that there are two fundamental theories of vicarious liability being used to try to impose liability on the parent for the putative and as yet undetermined and unestablished alleged breaches of contract of the lease by the subsidiary. They are piercing the corporate veil and the alleged impact of the subsidiary's return. First, piercing. The principal issue with the piercing claim is, as Judge Gilman alluded to with his question, the presence of the parental guarantee. At the time of contracting, the predecessor in interest of the appellants here, General Motors, very sophisticated major automotive manufacturer dealing with a major utility DTE, understood that it was dealing with a special purpose subsidiary that had been established solely for purposes of this transaction. What was this transaction? It was for the subsidiary to acquire the boilers and equipment from General Motors necessary to operate a utility plant for the Pontiac North plant, then to lease the property where that equipment was located, and then to provide long-term utility services to the Pontiac North plant, basically steam, electricity, and compressed air on a motor. General Motors concluded that it was not willing to voluntarily accept the risks of dealing only with the subsidiary, and therefore negotiated for at the time of contracting and obtained a limited right of additional recourse to the parent in the form of the parental guarantee, not of all of these contracts, but only of the utility services agreement. General Motors could have used in the terms of the guarantee all of the project contracts, all of the associated agreements, or it could have listed all of the contracts that it wanted a guarantee of. Instead, is utility service agreement the agreement that provides that the premises shall be maintained in the same condition and not allowed to deteriorate? The principal obligation in that regard is contained in the lease, Judge Griffin. The utility services agreement does contain a number of provisions with respect to the lease property, but its core provisions are that the subsidiary will provide long-term utility services to the Pontiac North plant. Okay, but the key of this case, I think, is that the claim that the subsidiary allowed the premises to deteriorate, that they did not maintain it. My question is, is that within the scope of the parental guarantee or not? You know, again, it arguably is within the scope of the utility services agreement, and therefore arguably would be... So it is arguably within the scope of the parental guarantee agreement? If the utility services agreement is live, and of course... Okay, so at this stage, 12B6, we should assume that DTE Energy is at least subject to that claim, subject to that claim unless the utility services agreement has been terminated, which it has as a matter of law, as well as the rejection and bankruptcy. The argument there is because the lease continued and the lease is integrated with the service agreement that the two are the same, and therefore they both continue. And to me, that kind of makes sense. The lease is only for $1, right? And I assume that having possession of the premises is worth more than $1, and the consideration is not the $1, but the terms of the service agreement, which include the duty to maintain the premises. Your Honor, the agreements certainly were integrated in the sense that they were all entered into at the same time, and that it was impossible for GM to reject one without rejecting them all. And that was certainly the position the subsidiary took in the General Motors bankruptcy case. But that does not mean that upon rejection of all of those agreements, that the subsidiary did not have the option to continue the lease without continuing the utility services agreement. Why? Because Section 7.2 of the lease expressly permits that. Section 7.2 of the lease expressly permits the subsidiary, when the utility services agreement is terminated, to continue to occupy the lease premises, and then sets forth a set of processes and procedures for determining the exact terms of that lease. So, the actual terms of these integrated contracts themselves expressly contemplate the possibility that the utility services agreement and all of its provisions relating to the lease would be terminated, and instead, the subsidiary would continue to occupy the premises on a triple net basis. Now, that provision of 7.2 of the lease does specify that the parties were supposed to, following a termination of the utility services agreement, attempt to negotiate the terms of a triple net lease, and they didn't do that. Instead, the subsidiary simply continued to occupy the premises. And Section 7.2 actually addresses that circumstance and says, when that happens, and the parties haven't negotiated a replacement lease, when the utility services agreement has terminated. So, it's our position that, effectively, the subsidiary was effectively a holdover tenant. And, frankly, the appellants here would have a legitimate claim for holdover rent against the subsidiary. What would the holdover rent be? Would it just be the $1? No, it would be fair market value. Holdover rent is always fair market value. But it would only be against the subsidiary, Your Honor. This is all a matter of trying to impose vicarious liability on a parent for matters well beyond the scope of its limited guarantee. The utility services agreement was clearly terminated by virtue of the rejection and bankruptcy. The appellants here recite the regular rule that rejection doesn't constitute termination. And that is correct, but it is incomplete. As the United States Supreme Court in the Mission Products case recently held, upon rejection, it is the option of the non-breaching party to treat that rejection as a termination or to continue the contract. Here, the subsidiary clearly expressed its intention to treat the rejection as a termination. We filed a proof of claim in the bankruptcy that indicated that we were excused from all further performance of that agreement. And that means termination. There is no way, even if we had wanted to, that we could have continued to perform the utility services agreement. There was no Pontiac plant there anymore to which to provide steam, electricity, or compressed air. There was the only real option here in the case of the utility services agreement rejection by GM and its bankruptcy was for us to treat it as a termination and excuse us from all further obligations there under. GM and hence the appellants here can't have it both ways. They can't reject that agreement and avoid their obligations under it, but still impose the obligations on the subsidiary and hence on DTE Energy as the parent under the guarantee to perform that agreement. It was frankly impossible for it to do so. What does this proof of claim have that you received some three million dollars for? What is that exactly? The proof of claim was the subsidiary's proof of claim in the General Motors bankruptcy for rejection damages. These are damages stemming from the rejection of the agreements from the fact that General Motors had said less than two years after entering into all these contracts with us, just kidding, we're not going to perform these agreements. And there were claims in the bankruptcy as a result of that. Now, you're generally only entitled to your pro-rata distribution in accordance with the bankruptcy code's priorities, but we were able to monetize that claim, obviously on cents on the dollar, by selling it to a third party. That's what that proof of claim was all about. But in that proof of claim, we made it very clear, Judge Moore, that we had taken the position that the rejection was a material breach of the utility services agreement that excused all further performance by the subsidiary and hence by the parent company under its guarantee. I'm not quite clear why Pontiac North continued their possession of the premises. Because we had the right to do so under 365 H1A double I. What interest was there for Pontiac North to continue the... We wanted to try to redevelop the property, Your Honor. The whole theory of the election under 365 H1A double I is to permit the lessee upon rejection of the lease in bankruptcy to retain its in-rim interests, its possessory interest in the lease property. We wanted to retain that to see if we could redevelop the property into a biomass plant, a solar plant, or in some other way. And we spent the next six years trying to do so and failing. You also let it deteriorate, right? Well, that's the allegation, Your Honor. Yes. But that is not, again, the only way that that would be an obligation of the parent is if the utility services agreement somehow survived rejection. And frankly, even if somehow it did magically survive rejection, the appellants here continued to default under it by failing to purchase utility services from us over the six-year period. But the bottom line is that neither party expected that the utility services agreement survived rejection in bankruptcy. Why? Because we didn't perform it. We didn't perform it starting at the date of rejection, the subsidiary ceased to perform all obligations under the utility services agreement. And at no point during the ensuing six-year period before this case was commenced did the appellants demand performance under the utility services agreement. So neither party contemplated performance under the utility services agreement after it was rejected in bankruptcy. Why? Because it was impossible. It was impossible to perform the utility services agreement after its rejection in bankruptcy. And because under the Mission Products case before the Supreme Court, it's very clear that the non-breaching counterparty has the right, upon rejection of its contract, to treat the contract either to continue it and claim damages or to treat it as a termination. We treated it as a termination, and we evidenced that election in our proof of claim that we filed with the bankruptcy court, making it very clear that we were excused from all further performance under the utility services agreement as a result of the rejection. Can you address the piercing of the corporate veil? Because that's an alternative theory which would let the plaintiffs succeed here. Yes, it is. And the principal problem, Judge Moore, with the piercing claim is again the presence of the parental guarantee. GM bargained for this additional limited right of recourse against the parent company under the utility services agreement. The appellants don't like that limited range of recourse and wish that that guarantee covered the entire range of contracts, but they don't. And so what they're using is piercing law as an attempt to obtain the same result that GM could have bargained for when it negotiated the terms of the parental guarantee, but it didn't. And we respectfully submit that although the district court did not rely exclusively on the presence of the parental guarantee as a basis for defeating the piercing claim and dismissing it, it probably could have and probably should have. The rule under Michigan law is that there's a presumption, even in the absence of this kind of guarantee, that when one deals with a the parent liable for the subsidiary's obligations. We submit that that presumption should become conclusive in a situation where there is a guarantee that has been negotiated against the parent so that the parent has obligations under that guarantee but don't have the obligations that are seeking to be pierced and imposed upon the parent. What case establishes that principle? Well, there are a number of cases that cited under Michigan law. The Servo Kinetics case recites that very clearly. And again, that was actually a case in which they held that the presumption was overcome. There was no guarantee in that case. And there was a whole host of facts. Basically, the subsidiary was acquired by a company after the contract was entered into. So the whole again, the anticipation, the expectations commercially of the parties upon entering into the contract were frustrated by the subsequent events, changes in the corporate structure. Here, GM knew what the corporate structure was. The corporate structure remained exactly the same and bargained for a limited guarantee just of the utility services agreement. But you just said that the Servo Kinetics had no guarantee. So I was asking, what is your best case for saying that if there is a limited guarantee that that means you can't pierce the corporate veil? I can't cite a case for that proposition, Your Honor. I'm simply drawing on the basic law that says if you voluntarily assume the risks of dealing with a subsidiary, that there is a presumption against piercing. Then if there's a guarantee that clearly evidences that knowledge and understanding, and then the party bargains for a limited right of recourse to address that level of risk and is satisfied with that risk, it's inappropriate to use piercing law to then expand that level of recourse to effectively rewrite the guarantee for the benefit of parties after the fact. And that's effectively what we contend the appellants are asking for here. Well, surely there could be veil piercing if a subsidiary is created for the purpose of deflecting any liability that the parent would normally have, so the fact that it's a parent's subsidiary situation does not automatically mean maybe there's a presumption, but it doesn't automatically mean you can't pierce. That is correct. There is a presumption there, and we're simply contending that in the case where there is on top of that a guarantee against the parent that has been negotiated for with full knowledge by the sophisticated parties here, a major automotive manufacturer and a major utility, they chose with their teams of lawyers to negotiate this narrow additional recourse against the parent that in that circumstance, piercing should not be used effectively to expand that guarantee. That's what the appellants are asking here effectively is to say, no, we don't want the guarantee to cover just the terminated utility services agreement. We wanted to cover all of these agreements, but that's not what the guarantee says, and that's not what GM negotiated for on the front end. As a result, your honor, I see my time is up. We believe that the district court correctly dismissed each of these claims at the pleading stage simply because any further amendments, they had two bites at the apple. Any further amendments would be futile. Thank you. Thank you. Mr. Phillips, you were better. Thank you, your honor. I want to start with the idea that of who's asking to have it both ways here related to the termination of the agreement. Mr. Partee says that it's us who wants it both ways, but it was DTE that required that these agreements be rejected or assumed as a group, not individually. Now he says that his client has the option to decide the effect of that rejection piecemeal on a contract-by-contract basis, and that is simply not the law. The case that we've cited in the court on this, the Samaritan Alliance case, makes clear that when there is an entire contract, an integrated agreement, and then they're assumed or rejected as a whole, then the result of that has to be done as a whole as well. There is not piece of authority, Mr. Partee can cite you for the idea, that his client had the option to stay on the property, have all the benefits of the lease, but also say, oh, by the way, this other agreement we don't like is terminated. That is simply not the law. You cannot legally terminate some and keep others. To get there... Did the bankruptcy court make a ruling on that or not? The bankruptcy court simply said that it required that they be rejected as a whole, and then said that the rights under 365H were reserved, and didn't make a decision on that any further than that. To get around this problem, Mr. Partee points to section 7.2 of the lease, but he's got a real problem there, and that is you have to read the whole lease. He takes that out of context. Section 7.2 does talk about what happens if the utility services agreement is terminated, but there's only one party who's allowed to terminate the utility services agreement, and that's GM. His client has no right under the utility services agreement or the lease to terminate. If you look to section 7.2, and then also take a look in the utility services agreement in section 25.02, it talks about events of termination. There's a schedule 11 to the utility services agreement that lists out the situations in which the utility services agreement can be terminated. They are all at GM's option, and when it lists out the results of a breach, there's nothing in the contract that gives DTE Energy the right to terminate as a result of a contractual breach. They didn't have the right to do this under the law by staying on the property. Their option here was to either stay or leave, and by staying, they submitted themselves to all of the terms of all of the agreements, including the parental guarantee. Then I briefly want to talk about Alter Ego. There is no authority for this ironclad rule that a parental guarantee means you can never pierce the corporate bail. It's merely a presumption. We're not asking to use the guarantee. What we're saying is that DTE Energy is responsible for what its subsidiary did or what it directed its subsidiary to do. That's the allegation. Again, the allegation is, and this is enough to overcome any presumption, is that DTE Energy left its subsidiary completely undercapitalized, holding a big bag of liability with no assets to cover it, and that's enough to pierce the corporate bail. For these two reasons, all the claims against DTE Energy should be remanded to the trial court. Thank you both. Your case will be submitted. We appreciate your arguments.